FILED
2025 Aug-29  AM 10:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

JIMMY ALLEN SWINDLE JR.,       )
                               )
            Plaintiff,         )
                               )
vs.                            )       Case No. 2:24-cv-00587-HNJ
                               )
SOCIAL SECURITY                )
ADMINISTRATION,                )
COMMISSIONER,                  )
                               )
            Defendant.         )

## MEMORANDUM OPINION

Plaintiff Jimmy Allen Swindle, Jr., seeks judicial review pursuant to 42 U.S.C. § 406(g) of an adverse, final decision of the Commissioner of the Social Security Administration ("Commissioner") regarding his claim for a period of a disability and disability insurance benefits. (Doc. 1).  The undersigned carefully considered the record, and for the reasons expressed herein, the court **AFFIRMS** the Commissioner's decision.[1]

## LAW AND STANDARD OF REVIEW

To qualify for benefits, the claimant must be disabled as defined by the Social Security Act and the Regulations promulgated thereunder.  The Regulations define

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73, the parties have voluntarily consented to have a United States Magistrate judge conduct any and all proceedings, including the entry of final judgment. (Doc. 15).

"disabled" as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which was lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a). To establish an entitlement to disability benefits, a claimant must provide evidence of a "physical or mental impairment" which "results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

In determining whether a claimant suffers a disability, the Commissioner, through an Administrative Law Judge (ALJ), works through a five-step sequential evaluation process. *See* 20 C.F.R. § 404.1520(a)(4). The burden rests upon a claimant at the first four steps of this five-step process; the Commissioner sustains the burden at step five if the evaluation proceeds that far. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018).

In the first step, the claimant cannot be currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520(b). Second, the claimant must prove the impairment is "severe" in that is "significantly limits [the] physical or mental ability to do basic work activities…" *Id.* at § 404.1520(c).

At step three, the evaluator must conclude the claimant is disabled if the impairments meet or medically equal one of the impairments listed at 20 C.F.R. Part 404, Subpart P, Appendix 1, §§ 1.00-114.02. *Id.* at § 404.1520(d). If a claimant's

impairment meets the applicable criteria at this step, that claimant's impairment would prevent any person from performing substantial gainful activity. 20 C.F.R. §§ 404.1520(a)(4)(iii), 404.1525. That is, a claimant who satisfies steps one and two qualifies automatically for disability benefits if the claimant suffers a listed impairment. *See Williams v. Astrue*, 416 F. App'x 861, 862 (11th Cir. 2011) ("If, at the third step, [the claimant] proves that [an] impairment or combination of impairments meets or equals a listed impairment, [the claimant] is automatically found disabled regardless of age, education, or work experience." (citing 20 C.F.R. §§ 404.1520, 416.920; *Crayton v. Callahan*, 120 F.3d 1217, 1219 (11th Cir. 1997)).

If the claimant's impairment or combination of impairments does not meet or medically equal a listed impairment, the evaluation proceeds to the fourth step, where the claimant demonstrates an incapacity to meet the physical and mental demands of past relevant work. 20 C.F.R. § 404.1520(e). At this step, the evaluator must determine whether the claimant has the residual functional capacity ("RFC") to perform the requirements of past relevant work. *See id.* § 404.1520(a)(4)(iv). If the claimant's impairment or combination of impairments does not prevent performance of past relevant, the evaluator will determine the claimant is not disabled. *See id.*

If the claimant succeeds at the preceding step, the fifth step shifts the burden to the Commissioner to provide evidence, considering the claimant's RFC, age, education, and past work experience, that the claimant can perform other work. *Id.* § 404.1512(b)(3), 404.1520(g). If the claimant can perform other work, the evaluator will

not find the claimant disabled. *See id.* § 404.1520(a)(4)(v); *see also id.* § 404.1520(g). If the claimant cannot perform other work, the evaluator will find the claimant disabled. 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1520(g).

The court must determine whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the proper legal standards. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). The court reviews the ALJ's "'decision with deference to the factual findings and close scrutiny of the legal conclusions.'" *Parks ex rel. D.P. v. Comm'r, Social Sec. Admin.*, 783 F.3d 847, 850 (11th Cir. 2015) (quoting *Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991)). Indeed, "an ALJ's factual findings… 'shall be conclusive' if supported by 'substantial evidence.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) (citing 42 U.S.C. § 405(g)). Although the court must "scrutinize the record as a whole… to determine if the decision reached is reasonable… and supported by substantial evidence," *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted), the court "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment" for that of the ALJ. *Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). "[W]hatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence… is 'more than a mere scintilla,' … [and] means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek*, 139 S. Ct. at 1154 (citations omitted). Therefore, substantial evidence exists even if the evidence preponderates

against the Commissioner's decision.  *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005).

## FACTUAL AND PROCEDURAL HISTORY

Swindle, age 56 at the time of the ALJ hearing, filed an application for disability and disability insurance benefits on December 21, 2021, alleging disability as of May 7, 2021.  (Tr. 65).  The Commissioner denied the application.  (Tr. 77).  Swindle requested reconsideration, which the Commissioner also denied.  (Tr. 78).  Swindle timely filed a request for hearing before an administrative law judge on March 6, 2023.  (Tr. 131-32). On September 6, 2023, the ALJ held a hearing. (Tr. 34-64).

The ALJ issued an unfavorable decision denying Swindle's claim on December 20, 2023.  (Tr. 12-28).  Applying the five-step sequential process, the ALJ found at step one that Swindle had not engaged in substantial gainful activity since the alleged disability onset date. (Tr. 17).  At step two, the ALJ determined Swindle manifested the severe impairments of post right occipital ischemic infarct (stroke), presbyopia, and mild cervical spondylosis.  (*Id.*).  However, the ALJ determined Swindle failed to demonstrate "ongoing or continuous restrictions" regarding status post patent foramen ovale (PFO) closure and obesity.  (Tr. 18).  Moreover, the ALJ determined Swindle's headaches could not be established as a medically determinable impairment. (Tr. 19).

At step three, the ALJ concluded Swindle did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments—specifically sections 1.00, 11.00, 11.04, and 12.00 (strokes); 2.00 and 2.03

(presbyopia); and 1.18 (mild cervical spondylosis)—in 20 C.F.R. Part 404 Subpart P, Appendix 1. (Tr. 20).

At step four, the ALJ found Swindle exhibited the residual functional capacity ("RFC") "to perform medium work as defined in 20 C.F.R. 404.1567(c) except for no work requiring left peripheral vision, no detailed or fine work requiring reading of font size under 12, no driving, no unprotected or unrestricted heights, no operating hazardous machinery, no climbing ladders, ropes, scaffolds, or ramps and occasional climbing of stairs." (Tr. 20). Moreover, the ALJ determined Swindle "[could] perform frequent stooping, crouching, kneeling and crawling" and "understand, remember, [and] carry out simple routine tasks involving one[-] and two[-]step instructions for two-hour periods." (*Id.*). In so finding, the ALJ "considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." (Tr. 21). To this end, the ALJ found "[w]hile the claimant's impairments are expected to impose some restrictions, the assertions of a complete inability to perform all substantial gainful [activity] appears overstated and inconsistent with the objective, clinical reports that fail to confirm the levels of intensity, persistence and limiting effects maintained." (Tr. 21). Given the afore-cited RFC, the ALJ deemed Swindle unable to perform any past relevant work since the alleged onset date. (Tr. 26-27).

Finally, taking Swindle's age, education, work experience, and RFC into account at step five, the ALJ concluded Swindle could perform a range of jobs that existed in

significant numbers in the national economy, including dishwasher, sandwich maker, and food service worker. (Tr. 27-28). Therefore, the ALJ concluded Swindle "has not been under a disability, as defined in the Social Security Act, from May 7, 2021, through the date of this decision . . . ." (Tr. 28).

Swindle filed a request for review of the hearing decision. (Tr. 187-88). On March 14, 2024, the Appeals Council denied Swindle's request for review, which deems the ALJ's decision the Commissioner's final decision. (Tr. 1-3). Swindle filed his Complaint in the present case on May 9, 2024. (Doc. 1).

## ANALYSIS

In this appeal, Swindle argues the ALJ's RFC determination "is neither supported by substantial evidence nor in accordance with applicable law." (Doc. 13 at 6). Specifically, Swindle contends "[t]he ALJ did not properly evaluate the record as a whole and erroneously relied upon isolated treatment notes to support his conclusion." (*Id.* at 7). Moreover, he claims the ALJ "ignored, overlooked, or misconstrued the evidence which is consistent with the Plaintiff's allegations of debilitating limitations." (*Id.* at 9).

For the reasons stated herein, the undersigned declines to reweigh the evidence in the record in Swindle's favor and finds substantial evidence supports the ALJ's ruling.

To determine whether a claimant can perform his past relevant work at step four or other work at step five, the ALJ must assess the claimant's RFC—the most a claimant can still do despite the physical and mental limitations resulting from his impairments.

*See* 20 C.F.R. §§ 404.1520(a)(4)(iv), 404.1520(e); *Phillips v. Barnhart*, 357 F. 3d 1232, 1238 (11th Cir. 2004) (*superseded by statute as stated in Portwood-Braun v. Commissioner of Social Security*, No. 22-11491, 2023 WL 2417856 (11th Cir. Mar. 9, 2023)).  The ALJ must base his decision on all relevant evidence in the record, including medical signs and laboratory findings, the effect of treatment including limitations or restrictions imposed by the mechanics of treatment (e.g., frequency, duration, disruption to routine, and side effects of medication), daily activities, lay evidence, recorded observations, and medical source statements.  *See* SSR 96-8p, 1996 WL 374184 at *5 (1996); 20 C.F.R. § 404.1545(a)(3).

When a claimant, as here, attempts to establish disability through his own testimony of pain or other subjective symptoms,

> [he] must satisfy two parts of a three-part test by showing: "(1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged pain; or (b) that the objectively determined medical condition can reasonably be expected to give rise to the claimed pain."

*Zuba-Ingram v. Comm'r of Soc. Sec.*, 600 F. App'x 650, 656 (11th Cir. 2015) (quoting *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (per curiam)).  A claimant's testimony coupled with evidence that meets the pain standard stands "itself sufficient to support a finding of disability."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (citations omitted).

Social Security Ruling ("SSR") 16-3p, effective March 28, 2016, and republished October 25, 2017, eliminates the use of the term "credibility" as it relates to assessing

the claimant's complaints of pain and clarifies that the ALJ "will consider any personal observations of the individual in terms of **how consistent** those observations are with the individual's statements about his or her symptoms as well as with all the evidence in the file." SSR 16-3p, 2017 WL 5180304, *7 (Oct. 25, 2017). An ALJ rendering findings regarding a claimant's subjective symptoms may consider a variety of factors, including: the claimant's daily activities; symptom location; duration, frequency, and intensity; precipitating and aggravating factors; type, dosage, effectiveness, and side effects of medication taken to alleviate the symptoms; and other factors concerning functional limitations and restrictions due to symptoms. *See* C.F.R. § 404.1529(c)(3), (4).

SSR 16-3p also clarifies the ALJ's burden when discrediting a claimant's subjective symptoms: "[I]t is not sufficient . . . to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." 2017 WL 5180304 at *10; *see also Wilson*, 284 F.3d at 1225 (If an ALJ

discredits a claimant's subjective testimony, the ALJ "must articulate explicit and adequate reasons for doing so.").

At the evidentiary hearing on September 6, 2023, Swindle testified he worked for Security Engineers for approximately 15 years. (Tr. 53). At the time he left the company, he worked as a security alarm installer, which entailed installing security systems and lifting or carrying 25-100-pound objects. (Tr. 236). Swindle testified he could not return to work following his stroke because his impaired eyesight rendered him unable to correctly install the security systems and use equipment, such as short stepladders, due to faulty depth perception. (Tr. 47). Swindle also described persistent headaches that impacted his ability to work but also responded tolerably to medication. (Tr. 45-47, 48). Furthermore, he reported loss of grip strength in his left hand, numbness in his lower left extremities, and persistent fatigue on his left side. (Tr. 40, 41).

On the date of the hearing, Swindle recounted 45 percent loss in his top, left peripheral vision and 32-33 percent loss in his bottom, left peripheral vision. (Tr. 40). He explained peripheral impairment results not from diminished visual acuity, but from faulty signals sent from his eyes to the occipital lobe in his brain, the location of his stroke. (Tr. 50-51). To that end, he remarked he does not drive unless circumstances necessitate, despite retaining his driver's license:

> I don't drive because things appear. I see things. The doctors told me that
> it's normal because . . . the brain puts things in blind spots . . . . I am scared

to death of things coming in and running over a kid, or being in an accident.

(Tr. 41). Swindle reported driving only in low traffic, including retrieving his daughter from school. (*Id.*).

Swindle stated he struggles with daily headaches registering an eight to ten out of ten on the pain scale. (Tr. 45). Swindle confirmed medication lessens the pain to a three to five out of ten but does not fully resolve the constant pain. (*Id.*). Swindle surmised medication changes may reduce his headaches to a tolerable level. (*Id.*). He testified he must take two to three pain pills a day, including one to promote rest. (Tr. 46). Swindle indicated his headaches peak around midday when he must lie in a dark room for approximately an hour. (*Id.*). He reported light exacerbates his headaches, which his doctor attributed to faulty signal transmission between his eyes and occipital lobe. (Tr. 49). Swindle indicated strobing sunlight through trees and movie theaters worsen his sensitivity. (Tr. 49-50).

Swindle next described his fatigue symptoms. He asserted he must rest for approximately 10 to 15 minutes after walking his dogs 50 yards. When engaging in more physical activities like vacuuming, Swindle indicated he can complete one room before he must rest for 30 minutes to an hour. (Tr. 42-43, 48-49). He reported no difficulty sitting for up to two hours at a time and standing for a 15-20 minute duration. (Tr. 49). He confirmed he can comfortably carry 20-25 pounds, though not on a consistent basis. (Tr. 43).

In a typical day, Swindle testified he engages in two total hours of physical activity with six to seven hours of rest. (Tr. 42, 44). He elaborated his day begins when he wakes up and ensures his 15-year-old daughter "[is] up ready to go to school." (Tr. 42). He recounted making his daughter and spouse breakfast, driving his daughter to school if necessary, and walking the dogs "a couple of times" per day. (Tr. 42, 44). In addition, he described making lunch for himself and his spouse and "get[ting] supper started for the family." (Tr. 44). His routine reportedly involves performing light housework when possible, such as vacuuming and loading the dishwasher. (Tr. 42, 44). He advised he requires many breaks and "[doesn't] get … all [housework] done in one day." (Tr. 44).

On March 8, 2022, Swindle, with the assistance of his spouse, completed a Function Report detailing his daily activities. (Tr. 247-54). Swindle reported he stays home for his minor daughter, but "she takes care of herself." (Tr. 249). Moreover, he stated he cares for his dogs with the help of his spouse. (*Id.*). He described his daily activities as waking up, taking care of personal hygiene, walking the dogs, eating breakfast, ensuring his daughter "is awake and ready for school," watching television, eating lunch, walking the dogs again, straightening the kitchen and living room, "cook[ing] a simple supper," rinsing dishes, watching television, and sleeping. (*Id.*). Swindle confirmed vacuuming twice a week, walking the dogs three to five times daily, loading the dishwasher occasionally, and taking out the garbage twice a week. (Tr. 250). He reported spending approximately 15 minutes preparing sandwiches and frozen meals. (*Id.*). He denied chopping or slicing food or reading recipes. (*Id.*).

12

Swindle indicated he shops for groceries twice a week for approximately 45 minutes to an hour; however, he only drives himself when necessary, in low traffic environments, and within five miles of home. (Tr. 251). To this end, his spouse primarily facilitates his transportation, and he shops with her approximately twice a month. (Tr. 248).

Swindle reported watching television with his spouse, talking to others on the phone, and fishing once a month with a particular friend (though his friend must now drive the truck and boat). (*Id.*). He declared watching television sometimes induces headaches and elicits difficulty following stories. (*Id.*). He advised others must fill out paperwork on his behalf, though he can pay bills, count change, and handle a savings account. (*Id.*). However, he disclosed an inability to use a checkbook or money orders due to poor focus. (Tr. 251).

Swindle reported his condition impairs his ability to squat, bend, reach, climb stairs, see, remember, complete tasks, concentrate, and get along with others. (Tr. 252). He asserted he can walk to his mailbox and back, around 100 yards, before requiring a one-minute rest. (*Id.*). He reported handling written instructions and coping with stress poorly. (Tr. 252-53). He denied difficulty following spoken instructions. (*Id.*). He claimed to adjust "fine" to routine changes and indicated no unusual fears or behaviors besides the fear of objects appearing suddenly in his periphery while driving. (Tr. 253). He indicated he gets along "fine" with authority figures. (Tr. 252).

Swindle reported his Lipitor medication causes tiredness, muscle aches, spasms, and a generally unwell feeling. (Tr. 254).

According to a cardiac questionnaire completed on March 8, 2022, Swindle reported no chest discomfort, shortness of breath, fatigue, weakness, lightheadedness, or other symptoms. (Tr. 259-61).

Swindle's spouse, Sheila, completed a third-party Function Report on March 8, 2022. (Tr. 223-30). Sheila described Swindle's daily activities as waking up, walking the dogs three times, watching television, driving their daughter one mile to school 15 minutes before regular drop-off to avoid traffic, and cooking easy suppers. (Tr. 224). Regarding their daughter, Sheila asserted, "[Swindle] is in the house so she will not be alone, but she does everything for herself." (*Id.*). She affirmed he takes care of the dogs with her help by walking them in the front yard. (*Id.*).

Sheila specified Swindle prepares "sandwiches, frozen dinners, and simple meals (microwavable sides)." (Tr. 225). She stated Swindle cannot prepare extravagant meals or those with several steps. (*Id.*). Sheila also stated Swindle performs some household chores. (*Id.*). By her account, he takes out trash once or twice a week, vacuums twice a week for 15 minutes, and washes dishes "a little all week." (*Id.*).

Sheila asserted Swindle drives only when necessary and takes their daughter to school because she leaves for work too early to do so herself. (Tr. 226). She clarified Swindle made an arrangement with their daughter's school to accommodate her arrival during low-traffic times. (*Id.*). Moreover, she remarked Swindle shops for groceries

once a week at stores near home. (*Id.*). She approximated Swindle shops for 45 minutes to an hour in such circumstances. (*Id.*).

Sheila indicated Swindle can count change but cannot pay bills, handle a savings account, or use a checkbook. (*Id.*). She confirmed Swindle occasionally shops with her and goes fishing once a month with a particular friend for social activity. (Tr. 227). Before his stroke, Swindle reportedly fished at minimum two full days a week. (*Id.*). After his stroke, his trips stand more infrequent, and he depends on his friend to drive his truck and boat due to fatigue. (*Id.*). Sheila indicated Swindle encounters problems watching television, as too much visual action or scenery changes exacerbate his condition. (*Id.*). In addition, Sheila observed Swindle does not go out or care to see others, exhibits a "grumpy" mood and less patience with people, and refuses to participate in golf or other activities requiring hand-eye coordination. (Tr. 228).

To this end, Sheila indicated Swindle appears to dislike her family and more readily expresses anger. (*Id.*). She reported Swindle handles stress poorly—he angers easily and yells—but adjusts to changes in routine despite disliking them. (Tr. 229).

Sheila characterized Swindle's breaks between periods of walking as brief, adding, "it looks more like he's investigating the surroundings." (Tr. 228). She observed Swindle occasionally loses balance or misses a step when walking. (*Id.*).

Sheila confirmed Swindle more effectively heeds spoken directions than written ones, though he "is more forgetful than before." (*Id.*). Regarding new, unusual fears and behaviors, Sheila asserted Swindle is "obsessed with the 'end of times'" and dislikes

"[Sheila] to be far from him unless [she is] at work." (Tr. 229). Sheila agreed Swindle gets along "fine" with authority figures. (*Id.*). She confirmed Swindle depends upon others to drive and fill out paperwork on his behalf. (Tr. 224, 227).

Swindle completed another Function Report on January 14, 2023. (Tr. 275-81). Swindle described his alleged disability as limiting his ability to work because

> [he cannot] drive to a location due to objects appearing[; his] range is off at least 6 inches[;] … his peripheral vision is affected (things, people, and cars are often not seen)[; he] cannot read or assemble the systems for security because it causes [his] eyes to cross[; and r]eading a short paragraph takes longer because [his eyes cross and] … [he has] to look away, come back, find [his] spot, read a little more and repeat.

(Tr. 275).

Swindle detailed his daily activities as waking up, walking the dogs three or four times a day for 15 minutes each, making breakfast for his daughter and ensuring she "is ready for school," making the bed, watching TV, and cooking dinner. (Tr. 276, 278). Swindle reiterated television induces headaches. (Tr. 279). He reported making dinner for his spouse and daughter and caring for his dogs with his spouse's help. (Tr. 276). Swindle described preparing sandwiches, crockpot meals, and frozen meals for 30 minutes daily "unless it's crockpot." (Tr. 277). He denied cutting and chopping because his vision suffers spatial distortion. (*Id.*). He confirmed cleaning, laundering clothes, mowing with a riding lawnmower, and performing "familiar activities." (*Id.*). He indicated mowing takes two hours and other chores take 30 minutes or more depending on their nature. (*Id.*).

Swindle reported he can go out alone, but only "in emergenc[ies]" within three miles of home and during low traffic. (Tr. 278). He stated he "will wait or not go" when traffic "is busy and flowing." (*Id.*). In any case, he denied driving more than five miles from home because his vision precludes him from seeing objects "coming at [him] on [his] left" or creates false images in his left periphery. (*Id.*). He confirmed shopping once or twice a week for 30 minutes to an hour at a store two miles from home. (*Id.*).

He represented he can count change and handle a savings account, but he cannot pay bills or use a checkbook due to poor focus and inability to write on lines. (*Id.*). For social activity, Swindle declared he uses the phone daily and goes fishing with a particular friend once a month. (Tr. 279). In addition, he indicated he visits family members weekly or biweekly. (*Id.*). He reported difficulty handling stress and changes in routine. (Tr. 280). Further, he alleged the stroke negatively affected his balance "somewhat" and his memory "a little." (Tr. 281).

In his opinion, the ALJ summarized Swindle's hearing testimony regarding his symptoms. The ALJ determined Swindle's "impairments do not impose the level of restrictions alleged and that the symptoms [from] his s/p right occipital ischemic infarct (stroke), presbyopia, and mild cervical spondylosis, do not preclude work activity consistent with his assigned residual functional capacity." (Tr. 28). The ALJ detailed Swindle's medical evidence from May 2021 to July 2023 to support his decision, highlighting records depicting Swindle routinely exhibited normal strength and motor skills, satisfactory visual acuity, and adequate mental faculties. (Tr. 18-26).

In determining the claimant's disability under the aforementioned pain standard, an ALJ may consider evidence from before or after the relevant period between the alleged onset date of his disability and the date last insured, so long as the information bears on the claimant's disability during the relevant time. *Douglas v. Commissioner of Soc. Sec.*, 486 Fed. App'x 72, 75 (11th Cir. 2012) ("[The ALJ] properly applied this circuit's pain standard, taking into account evidence during the relevant period. He also considered evidence from before and after the relevant period that would have bearing on Douglas's disability during the relevant time."). To this end, the full medical record—including records pre-dating the alleged onset date—serves as substantial evidence supporting the ALJ's RFC determination given Swindle's symptoms stemming from his status post right occipital ischemic infarct (stroke), presbyopia, and mild cervical spondylosis.

On February 3, 2021, Swindle visited Day Eye Care clinic for assessment of his vision. (Tr. 583). The physician evaluated poor close-up vision and accordingly diagnosed him with presbyopia. (Tr. 583, 584).

On May 7, 2021, Swindle began experiencing headaches, significantly blurred vision, and tingling and loss of sensation in his lower left and upper extremities lasting approximately 15-20 minutes. (Tr. 374).

After recurrence of the foregoing symptoms for two days, Swindle visited Norwood Clinic on May 10, 2021. (Tr. 376). Upon physical examination, clinic staff noted Swindle displayed no acute distress, possessed normal eye anatomy, exhibited

normal heart rate, experienced no edema, and displayed normal posture and gait. (*Id.*). Swindle received a referral to the University of Alabama at Birmingham Emergency Department. (Tr. 376).

Upon arriving at UAB Hospital the same day, attendants chronicled the same symptoms identified by Norwood Clinic. (Tr. 321, 329-30). Medical staff noted such symptoms persisted upon closing either eye. (*Id.*). Swindle denied migraines, nausea or vomiting, ataxia, dysarthria, dysphagia, or vertigo. (*Id.*). He appeared alert and in no acute distress; exhibited normal peripheral perfusion, clear lungs, and intact extraocular movements with no edema or aphasia; breathed in a non-labored manner; possessed strength in his extremities; and ambulated with an unassisted and balanced gait. (*Id.*). Further, his skin appeared normal, he possessed no conjunctiva or tachycardia, he exhibited level consciousness despite a headache, and he portrayed cooperativeness with appropriate mood and affect. (Tr. 328). He did not report back pain, joint pain, muscle pain, difficulty walking, or spasticity in the legs. (Tr. 330). Swindle complained of forgetfulness, confusion, tingling, headaches, abnormal balance, numbness, falls, muscle weakness, and spasticity. (*Id.*). He displayed regular heart rate and rhythm and exhibited no apparent cyanosis, clubbing, or edema regarding his extremities and spine. (Tr. 331). His neurologic exam reflected alertness, good memory and recall, appropriate affect, and no dysarthria. (*Id.*).

Hospital staff conducted a cranial nerve exam and reported Cranial Nerve 2 as "[left] homonymous blurry vision." (*Id.*). The other cranial nerves revealed intact

ocular movement without nystagmus, facial sensation intact to light touch throughout, symmetrical facial strength, normal bilateral hearing, and no impairment of palate elevation and speech. (*Id.*). His motor skills and sensory abilities appeared normal in all extremities when tested for light touch, vibration, pinprick, and temperature. (*Id.*). On the stroke scale, he scored a zero (*id.*), and his cervical and intracranial CT angiograms returned normal results. (Tr. 332). However, another CT angiogram revealed Swindle suffered a stroke. (Tr. 332, 336). Physicians discharged Swindle from UAB Hospital on May 12, 2021. (Tr. 323).

On May 28, 2021, Swindle participated in a telehealth visit with eMedicine Stroke Clinic. (Tr. 414, 493). A nurse practitioner recorded Swindle felt well since his discharge from UAB Hospital and experienced no new stroke events. (Tr. 414). However, he reported continuing headaches minimally improved by Tylenol PRN. (*Id.*). He also stated he experienced left vision field blurriness, did not drive, and had not returned to work. (*Id.*).

On June 1, 2021, Swindle endorsed no cardiovascular, respiratory, musculoskeletal, or psychiatric problems. (Tr. 505). However. he complained of weakness, fatigue, blurry vision, dizziness, nasal congestion, numbness, headaches, and tingling. (*Id.*). The examiner assessed "[c]erebral infarction due to unspecified occlusion or stenosis of right posterior cerebral artery" and indicated she would refer Swindle to neuro-opthalmology. (Tr. 508). She instructed Swindle to refrain from driving until "cleared by optho[mology]." (*Id.*).

Swindle visited Callahan Eye Clinic at UAB on July 6, 2021, to receive a stroke evaluation. (Tr. 356). Clinic staff noted Swindle lost peripheral vision in his left eye due to homonymous quadrantopsia. (Tr. 360). Moreover, he continually experienced intermittent headaches, which he attributed to sinus issues. (Tr. 356). He denied double vision, dizziness, or nausea. (*Id.*). However, he indicated he sees spots when closing his eye. (*Id.*). He raised no other concerns. (*Id.*).

The clinic examiner marked Swindle negative for fatigue, fever, and night sweats; hearing loss; coughing and wheezing; chest pressure, chest discomfort, and irregular heartbeat or palpitations; vomiting; dizziness, gait disturbance, and headache;[2] emotional changes; arthralgia, joint swelling, and muscle weakness; and bruising and easy bleeding. (Tr. 357-58). His visual acuity measured adequately, at 20/25 and 20/25+2 in the right and left eyes, respectively. (Tr. 358). His mood and affect appeared normal. (Tr. 359). He exhibited normal pupils; confrontation fields full to finger counting; full ocular motility; normal adnexa; and normal lids, lashes, conjunctivae, corneas, irises, anterior chambers, lenses, vitreous fluid, optic nerves, maculae, retinal vessels, and periphery. (Tr. 359-60). Swindle did not complain of transient visual obscurations, headache, tinnitus, auditory or visual hallucinations,

---

[2] Although Swindle reported intermittent headaches at the visit in question, he attributed them to sinus attacks. (Tr. 356). The systems review reasonably reflects Swindle did not suffer headaches upon examination.

ataxia, slurred speech, facial droop, or extremity weakness. (Tr. 360). He complained of difficulty with navigation and reading. (*Id.*).

The examining physician assessed left homonymous hemianopsia and blurred bilateral vision. (Tr. 361). He explained Swindle's vision would not return to normal, but he anticipated improvement between three and six months before plateau. (Tr. 361). Further, he cautioned Swindle about the risk of fall or trauma from his blind side, and he received instructions to improve his difficulties with reading. (*Id.*).

On August 30, 2021, Swindle presented to the UAB Low Vision Clinic to complain of peripheral vision loss following stroke with slight improvement since onset. (Tr. 492). Swindle reported he could drive (albeit not on an interstate) and experienced trouble reading. (*Id.*). His visual acuity measured adequately, though he reported things "go blurry" when reading more than three words. (*Id.*). With trial frames, Swindle reported no improvements in his near vision. (Tr. 504). The examining physician diagnosed Swindle with homonymous bilateral field defects of the left eye, particularly left superior quadrantopsia from right PCA (posterior cerebral artery) infarct, presbyopia, and right PCA infarct. (*Id.*) Regarding his quadrantopsia, the physician wrote:

> Hemianopia occurs when there is damage to the visual processing portion of the brain, usually due to stroke . . . because [half] of the vision in each eye is processed on each side of the brain, damage to one side of the brain usually causes visual field loss on the opposite side. Right-sided stroke causes sudden left side vision loss. Recovery can occur for up to a year, but most occurs within the first 3-4 months.

(Tr. 504).

On August 31, 2021, Swindle participated in a telehealth visit with the UAB Structural Heart and Valve Disease Clinic, stating he felt "fine." (Tr. 409). Swindle maintained peripheral vision loss and indicated low physical activity levels since his stroke. (Tr. 409). Due to his sedentariness, he gained 25 pounds. (*Id.*). Swindle expressed eagerness to proceed with PFO (patent foramen ovale)[3] closure and resume a normal lifestyle. (*Id.*). He denied any other cardiac symptoms, including chest pain, shortness of breath, dyspnea on exertion, paroxysmal nocturnal dyspnea, orthopnea, dizziness, palpitations, leg edema, syncope or near syncope, falls, or recent ER visits. (*Id.*). The clinic examiner indicated Swindle appeared alert and oriented, portrayed cooperativeness, and displayed appropriate mood and affect. (Tr. 411). The examining physician's impression noted stroke, PFO, and peripheral vision loss as a residual deficit of stroke. (Tr. 411).

Swindle presented for a follow-up appointment at UAB Stroke Clinic on September 22, 2021. (Tr. 377). Swindle stated he cannot drive or return to work due to continuing left vision blurriness. (Tr. 377-78). He denied recurrent sudden changes in vision and speech, lateralized weakness, numbness, and incoordination. (Tr. 377). Swindle affirmed he passed his driver's test despite scarcely driving and followed a care

---

[3] "A patent foramen ovale (PFO) is a hole in the heart that didn't close the way it should after birth. The hole is a small flaplike opening between the upper heart chambers." MAYO CLINIC, https://www.mayoclinic.org/diseases-conditions/patent-foramen-ovale/symptoms-causes/syc-20353487 (last visited August 25, 2025).

regimen with UAB Callahan Eye Clinic. (Tr. 377-78). At the time of the appointment, he maintained an appointment for PFO closure on the following Friday. (Tr. 378).

The clinic examiner conducted a physical assessment and reported Swindle appeared alert and oriented and breathed in a non-labored manner. (Tr. 379). On the NIH stroke scale, Swindle returned a score of 1 due to partial hemianopia. (*Id.*). His mood and affect appeared appropriate, and he possessed a normal gait. (*Id.*).

Swindle underwent PFO closure on October 1, 2021. (Tr. 423). He did not report recent visual problems, double vision, chest pain or palpitations, muscle pain, confusion, or numbness. (Tr. 424). Once admitted to the hospital, he underwent the procedure without issue and remained stable afterwards. (Tr. 425). Following bedrest, the hospital discharged him in good condition. (*Id.*). Upon physical exam thereto, he appeared alert, oriented, cooperative, and in no acute distress, and he exhibited clear lungs, non-labored breathing, normal heart rate and rhythm, normal peripheral perfusion, and normal judgment. (Tr. 426). He did not demonstrate edema or heart murmur. (*Id.*).

On November 9, 2021, Swindle presented at the UAB Structural Heart and Valve Clinic following his PFO closure. (Tr. 490). The examining physician described the implanted device as "nicely seated" and the site as well-healed without complication. (*Id.*). Swindle reported feeling well since the procedure and denied additional stroke or neurologic changes. (*Id.*). The clinic examiner indicated Swindle did not experience cardiac symptoms such as chest pain, shortness of breath, palpitations, leg edema,

orthopnea, paroxysmal nocturnal dyspnea, syncope, or falls. (*Id.*). However, Swindle complained of residual vision change affecting his left peripheral vision, as well as side effects including easy bruising and fatigue from the medication Plavix. (*Id.*). The clinic examiner reported he was "working and feels that he is not limited in his daily activities." (Tr. 497). Swindle did not raise any other cardiac concerns. (*Id.*). On physical exam, he portrayed alertness, orientation, and no acute distress. (Tr. 499). He reportedly possessed normal-appearing eyes, clear lungs, normal heart rate and rhythm, and normal range of motion. (*Id.*). He displayed cooperativeness with appropriate mood and affect. (*Id.*).

Swindle visited Day Eye Care on February 10, 2022, to complain of persisting peripheral vision loss after stroke. (Tr. 586). A clinic practitioner conducted an eye exam and recorded Swindle had full motility, visual fields full to confrontation, and normal eye anatomy. (*Id.*). The examiner marked Swindle's periphery as normal, yet simultaneously acknowledged he endured peripheral vision loss from stroke. (Tr. 586, 587). The examining physician assessed presbyopia. (Tr. 586).

On April 6, 2022, Swindle returned to UAB Callahan Eye Clinic for evaluation of hemianopia. (Tr. 448). Swindle reported no major changes in his vision. (*Id.*). He stated he had begun training himself to look directly at objects, although such objects tended to become blurry. (*Id.*). He reported daily headaches attributable to sinus issues, a numb sensation in his fingertips, and difficulty with navigation and reading. (Tr. 448, 451).

On physical exam, Swindle exhibited normal pupils; confrontation fields full to finger counting; full ocular motility; normal adnexa; and normal lids, lashes, conjunctivae, corneas, irises, anterior chambers, lenses, vitreous fluid, optic nerves, maculae, retinal vessels, and periphery. (Tr. 449-50). The clinic examiner marked Swindle negative for fatigue, fever, and night sweats; hearing loss; cough and wheezing; chest pressure, chest discomfort, and irregular heartbeat or palpitations; vomiting; dizziness, gait disturbance, and headache; emotional changes; arthralgia, joint swelling, and muscle weakness; and bruising and easy bleeding. (Tr. 449). His visual acuity presented satisfactorily at 20/20-1 and 20/20-1 in the right and left eyes, respectively. (*Id.*). Swindle did not complain of transient visual obscurations, headache, tinnitus, auditory or visual hallucinations, ataxia, slurred speech, facial droop, or extremity weakness. (Tr. 451). He displayed no paresthesia of the face. (*Id.*).

The examiner assessed quadrantopsia. (Tr. 451). The examiner explained Swindle's vision would not return to normal, but some improvements might occur within three to six months before reaching plateau. (*Id.*). Again, the examining physician cautioned Swindle about the risk of fall or trauma stemming from his blind side, and he instructed Swindle to improve that risk with reading. (*Id.*).

Swindle visited the UAB Emergency Department on May 20, 2022. (Tr. 511). Swindle reported experiencing daily headaches and tingling in the fourth and fifth digits on his left hand for two months. (*Id.*). He denied any other complaints and did not mention recent vision problems, shortness of breath, chest pain, or back pain. (*Id.*). A

physical exam indicated alertness, lack of acute distress, regular hear rate and rhythm, non-labored breathing, lack of focal neurological deficit, normal sensory and motor skills, and normal speech. (Tr. 512). Swindle displayed cooperativeness and appropriate mood and affect. (*Id.*). The examining physician diagnosed Swindle with headache and paresthesia. (Tr. 513).

On October 5, 2022, Swindle visited the UAB Stroke Clinic. (Tr. 552). He reported discontinuing atorvastatin but remaining on aspirin. (Tr. 553). Swindle confirmed he passed his driving evaluation. (*Id.*). He endorsed symptoms of irritability, memory trouble, and daily bilateral headaches registering a four or five out of ten on the pain scale. (*Id.*). Swindle indicated taking two to four doses of Excedrin reduced his headache pain to a one out of ten. (*Id.*).

On February 2, 2023, Swindle returned to Day Eye Care for a routine appointment. (Tr. 590). He still lacked peripheral vision, but his condition had not worsened. (*Id.*). Swindle's stroke doctor monitored his headaches. (*Id.*). The clinic examiner determined Swindle's eye anatomy appeared normal, and a confrontation visual field test returned normal results. (Tr. 590-91). However, he exhibited reticular degeneration in his periphery, causing peripheral visual field loss. (*Id.*). His visual acuity measured adequately: 20/25-2 and 20/21-1 in the right and left eyes, respectively. (Tr. 590).

On February 22, 2023, Swindle returned to Day Eye Care to complain of blurry vision at a distance. (Tr. 594). The clinic examiner determined Swindle possessed full

motility in his eyes, and a confrontation visual field test returned normal results.  (Tr. 594-95).  However, Swindle suffered reticular degeneration and peripheral vision loss. (Tr. 594-95).  Swindle appeared alert, oriented, and in no acute distress.  (Tr. 595).  The examining physician confirmed a diagnosis of presbyopia.  (Tr. 592).

On April 25, 2023, Swindle visited Norwood Clinic for an annual physical and labs.  (Tr. 460-61).  He denied shortness of breath, chest pain, dyspnea, or other complaints.  (Tr. 461).  He did not report chest pain, arm pain on exertion, shortness of breath when walking or lying down, palpitations, ankle swelling, cough, wheezing, coughing up blood, sleep apnea, muscle aches or weakness, arthralgia or joint pain, back pain, swelling in the extremities, neck pain, difficulty walking, cramps, loss of consciousness, weakness, numbness, seizures, dizziness, headaches, tremors, gait dysfunction, or paralysis.  (Tr. 461-62).  Swindle appeared healthy, well-nourished, and well-developed.  (Tr. 462).  He reportedly exhibited no acute distress, ambulated without assistance, and his peripheral vision and acuity appeared grossly intact.  (*Id.*). No signs manifested of dyspnea or wheezing, and he exhibited good air movement in his lungs.  (*Id.*).  His muscle tone, motor strength, movement in all extremities, and gait and station appeared normal.  (*Id.*).  Further, the clinic did not observe cyanosis or edema. (*Id.*).  Importantly, he reported no fatigue and no anemia.  (*Id.*).

Swindle presented for a consultative medical exam with Dr. Robert Kline on May 11, 2022.  (Tr. 485).  According to Dr. Kline, "nothing unusual" presented about Swindle's motor skills or mannerisms.  (Tr. 486).  His speech, thought, and

28

conversations appeared normal, and he exhibited euthymic mood with a normal range of affect. (*Id.*). He did not display loose association, tangential thinking, poor memory, phobias, or obsessions. (*Id.*).

Swindle reported his daily activities as "[getting] his 13-year-old daughter up in the morning and [getting] her off to school" and performing household chores such as lawncare, laundry, and food preparation. (Tr. 487). Swindle reported fishing occasionally; attending church regularly; shopping at stores twice a week; talking with neighbors, friends, and family daily; getting along with others; and refraining from any serious fights within the last six months. (*Id.*).

Dr. Kline opined Swindle possessed "a mild restriction of activities, no constriction of interests, and no restriction in his ability to relate to others." (*Id.*). Moreover, Dr. Kline found Swindle could manage benefits; function independently; adequately understand, remember, carry out instructions, and respond appropriately to supervisors and coworkers; and work in a pressured setting. (*Id.*). Dr. Kline determined Swindle displayed an adequate ability to interact with friends and family and understand, remember, and carry out one-to-two-step instructions. (*Id.*). Swindle indicated he "regained almost everything except his left peripheral vision" since his stroke. (Tr. 485).

Swindle presented for a consultative exam with Dr. Gary C. Few on June 29, 2022. (Tr. 545-46). Dr. Few noted Swindle exhibited good patient coordination. (Tr. 546). He assessed "congruous left [superior] quadrantopsia with some extension into the inferior quadrant." (Tr. 546).

Swindle visited Day Eye Care on August 9, 2022. (Tr. 597). The clinic examiner determined Swindle possessed full motility, normal confrontation visual field test results, and normal eye anatomy. (*Id.*). The examiner assessed reticular degeneration and peripheral visual field loss. (Tr. 598).

On December 6, 2022, Swindle visited the UAB Structural Heart and Valve Clinic for a one-year follow-up post-CFO closure. (Tr. 554). The examiner described Swindle as alert, oriented, and cooperative. (Tr. 557). He possessed clear lungs and non-labored breathing, normal heart rate and rhythm, appropriate in mood and affect, and no edema. (*Id.*). The prescription drug nortriptyline appeared among his medications. (*Id.*).

A June 23, 2023, brain MRI revealed chronic infarction of the right occipital lobe, old lacunar infarctions of the cerebellum, and no acute intracranial lesion. (Tr. 605).

On June 28, 2023, Swindle presented to the UAB Stroke Clinic "for evaluation after stroke." (Tr. 601). Swindle described daily headaches that were bilateral, band-like, mild in intensity, and somewhat improved by Excedrin. (Tr. 603). In addition, Swindle reported constant tingling for some months manifesting in his left thumb, index finger, and the top of his foot. (*Id.*). The examining physician opined Swindle appeared alert and oriented; breathed in a non-labored manner; and exhibited clear speech, coherence, and intact cognition. (Tr. 604). His gait appeared normal, and he displayed appropriate mood and affect. (*Id.*). Swindle did not demonstrate facial paresis, abnormal motor function in the arms or legs, ataxia, aphasia, dysarthria, extinction,

inattention, or abnormal sensory abilities. (*Id.*).   The examiner assessed partial hemianopia and a left superior quadrant vision field deficit. (*Id.*).

The examining physician recorded the following impression: "cerebral infarction due to unspecified occlusion or stenosis of right posterior cerebral artery: A/S due to embolism. Etiology: ESUS [Embolic Stroke of Undetermined Source], likely paradoxical embolism from PFO grade 3 on TCD [Transcranial Doppler]; large on TEE [transesophageal echocardiogram]." (Tr. 607).  In addition, the examiner assessed modest depression, daily headache, and paraesthesias, and he commented Swindle "continued to be fully disabled due to visual field cut and left hemineglect." (*Id.*). Regarding Swindle's headaches, the physician increased Swindle's dosage of nortriptyline to 25 mg and commented he would consider referral if the higher dosage did not elicit improvement. (*Id.*).

On July 24, 2023, Swindle presented at North Gardendale Primary Care for a physical. (Tr. 570).  He complained of neck and back pain, regular headaches irritated by light, weakness down his upper left extremity, and decreased handgrip. (Tr. 570-71). Swindle did not experience muscle aches, weakness, arthralgia, joint pain, swelling in the extremities, difficulty walking, vision change or irritation, chest pain, arm pain on exertion, shortness of breath when walking or lying down, palpitations, ankle swelling, loss of consciousness, dizziness, headache, tremor, gait dysfunction, paralysis, mental health issues, mood swings, memory loss, or fatigue. (Tr. 571).  He appeared active and alert, possessed normal mood and affect, and manifested no signs of dyspnea or heart

murmur. (*Id.*). Rather, Swindle's heart rate, breathing, motor strength and tone, gait, and sensory abilities reportedly manifested normally. (*Id.*). The examining physician reported Swindle's "[s]trength of left hand is 3 out of 5 with handgrip" and ordered a cervical CT scan. (Tr. 571-72). The examiner assessed migraine without aura, cervical radiculopathy, degeneration of cervical intervertebral disc, and muscle weakness. (Tr. 572).

On July 27, 2023, Swindle returned to North Gardendale Primary Care to receive cervical imaging. (Tr. 573). Swindle reported he can take care of himself; does not experience trouble concentrating, remembering, or making decisions; walks and climbs stairs without difficulty; runs errands alone without trouble; and does not experience transportation difficulties. (Tr. 568). Moreover, Swindle did not experience muscle aches, weakness, arthralgia, joint pain, swelling in the extremities, difficulty walking, vision change or irritation, chest pain, arm pain on exertion, shortness of breath when walking or lying down, palpitations, ankle swelling, loss of consciousness, dizziness, headache, tremor, gait dysfunction, paralysis, mental health issues, mood swings, memory loss, or fatigue. (Tr. 565).

Cervical imaging revealed a normal vertebral body height, alignment without fracture or subluxation, and mild degenerative disc changes at C5-6 and C6-7. (Tr. 573). His spinal cord presented normally in signal, caliber, and contour. (*Id.*). The clinic diagnosed Swindle with cervical spondylosis with mild foraminal narrowing. (*Id.*).

The foregoing records—considered as a whole—provide substantial evidence to support the ALJ's RFC determination, and the ALJ properly cited objective medical evidence refuting the severity of Swindle's alleged physical and mental symptoms.

At the evidentiary hearing, Swindle described persistent headaches registering an eight to ten out of ten. (Tr. 45). He confirmed medication generally lessens his pain to a three to five out of ten. (*Id.*). To this end, he described taking two to three pain pills per day and resting in a dark room for approximately an hour. (*Id.*). He indicated strobing light exacerbates his pain and sensitivity. (Tr. 49-50; 248; 279).

As an initial matter, the ALJ determined Swindle could not establish headaches as a medically determinable impairment. (Tr. 19); *see also* SSR 19-4p, 2019 WL 4169635, *4 (Aug. 26, 2019) ("physicians diagnose a primary headache disorder only after excluding alternative medical and psychiatric causes of a person's symptoms"). Insofar as Swindle alleged his headaches amounted to stroke symptoms, the record demonstrates such symptoms did not rise to debilitating levels. Although Swindle complained of headaches on several occasions (*see* tr. 330, 356, 374, 414, 448, 505, 511, 553, 570, 590, 603), he also indicated his headaches responded tolerably to medication (*see* tr. 45 ("And on medication, it actually goes down to a four to a five…. [T]here to a five is when I'm on medication."), 553 ("Takes 2-4 Excedrin daily but this does not alleviate pain completely – reduces to 1/10."), 603 ("Excedrin helps")). Moreover, Swindle occasionally attributed his headaches to sinus attacks. (Tr. 356, 448). Thus,

the ALJ's RFC assessment accounted for the severity of Swindle's headache symptoms as supported by the record.

Regarding his eyesight, Swindle testified his stroke resulted in 45 percent loss in his top, left peripheral vision and 32-33 percent loss in his bottom, left peripheral vision. (Tr. 40). Swindle indicated he detects blind spots and phantom objects in his periphery. (Tr. 41). Accordingly, he reported driving only in emergencies and in low-traffic environments. (Tr. 41, 226, 251, 275, 278). He also described difficulty reading text and writing. (Tr. 250, 275, 278, 360, 451, 492).

Although the record certainly confirms a significant and lengthy history of compromised eyesight, Swindle's symptoms do not render him unable to perform any substantial gainful activity. For example, Swindle retained his driver's license and confirmed his ability to drive in low-traffic environments. (Tr. 41, 377, 492, 553). Moreover, the ALJ properly accounted for Swindle's compromised peripheral vision in the RFC assessment, indicating Swindle could not use his left peripheral vision, read font sizes under 12, or drive. (Tr. 20).

Swindle testified he has suffered poor arm and grip strength on his left side and numbness in his left leg and foot for at least two years since his stroke. (Tr. 40). However, the record rejects such a contention—Swindle reported weakness down his left side and decreased grip strength for the first time in July 2023. (Tr. 570-71). No recorded decreases in motor strength manifested on May 10, 2021, July 6, 2021, April 6, 2022, and April 25, 2022. (Tr. 329-30, 357-58, 449, 462). In addition, a cervical MRI

indicated Swindle's loss of strength originated from mild, cervical spondylosis. (Tr. 571-72). Furthermore, although Swindle allegedly suffered from left-side fatigue since his stroke, he made no reports of muscle weakness on July 6, 2021, August 31, 2021, September 22, 2021, April 6, 2022, and April 25, 2022. (Tr. 357-58, 377, 450, 461-62). In any case, the ALJ's RFC assessment accounts for Swindle's complaints of weakness, as it includes several related functional limitations. (Tr. 20). In particular, the ALJ determined Swindle cannot encounter unprotected or unrestricted heights; operate hazardous machinery; or climb ladders, ropes, scaffolds, or ramps. (*Id.*). Moreover, Swindle may only occasionally climb stairs. (*Id.*).

Though Swindle reported difficulty with navigation on July 6, 2021, April 6, 2022, and January 14, 2023, he did not testify at the ALJ hearing he suffered any such ailment. (Tr. 360, 451, 281). Moreover, his medical reports described his gait as normal on May 10, 2021; July 6, 2021; September 22, 2021; April 25, 2022; June 28, 2023; July 24, 2023; and July, 27, 2023. (Tr. 376, 357, 379, 461-62, 604, 571, 568).

Swindle testified his stroke produced symptoms of fatigue. (Tr. 41). Specifically, he explained he requires six or seven hours of rest in a typical day. (Tr. 42, 44). He testified he cannot lift 20-25 pounds on a regular basis but can conduct "light housework." (Tr. 43, 42, 44). He stated he cannot complete typical housekeeping activities in a single day because he requires frequent breaks. (Tr. 42, 44). He reported resting for ten to 15 minutes after walking his dogs. (Tr. 42-43). He reportedly tolerates 15-20 minutes of standing at a time. (Tr. 49). Since his stroke, Swindle endorsed

fatigue, tiredness, or both on August 31, 2021, November 9, 2021, and March 8, 2022, particularly as to side effects from Plavix and Lipitor. (Tr. 254, 490, 505).

The record includes evidence contradicting Swindle's reports of fatigue. For example, Swindle denied or failed to report fatigue or tiredness on July 6, 2021, July 24, 2023, April 25, 2023, and July 27, 2023. (Tr. 357-58, 571, 462, 565). In addition, he denied or did not report cardiac symptoms evidencing fatigue, including orthopnea, dizziness, palpitations, leg edema, syncope or near syncope, chest pain, and shortness of breath, on August 31, 2021, November 9, 2021, and March 8, 2022. (Tr. 409, 490, 259-61). On May 10, 2021, September 22, 2021, October 1, 2021, November 9, 2021, April 25, 2022, May 20, 2022, July 24, 2023, and July 27, 2023, Swindle denied difficulty breathing. (Tr. 376, 378-79, 426, 499, 462, 511, 571, 565). His muscle strength and tone appeared normal on April 25, 2022, July 24, 2023, and July 27, 2023, excepting the weakness in his left hand. (Tr. 462, 571, 565, 570). Further, although Swindle testified he requires a ten- to 15-minute break after walking his dogs, (tr. 42-43), his spouse indicated he only needed a one-minute break for the same activity (tr. 252).

Although Swindle occasionally complained of poor memory and concentration (Tr. 252, 281), the record reflects he exhibited adequate concentration skills during his exam with Dr. Kline in May 2022 (tr. 486-87), and reportedly possessed satisfactory coherence, cognition, or recall skills on May 10, 2021, September 22, 2021, and June 28, 2021 (tr. 331, 371, 604), despite an assessment consistent with left hemineglect on June 28, 2023 (tr. 607). He complained of memory issues on October 5, 2022 (tr. 553),

but forewent similar reports at his July 24, 2023, and July 27, 2023, appointments (tr. 569, 573), and such complaints appeared for the first time in Swindle's medical records months after he alleged them initially in his March 2022 Function Report (Tr. 571), despite attending appointments in the intervening period.

Besides peripheral vision loss, the record does not sustain any serious residual stroke symptoms. As the ALJ properly noted, Swindle even represented to Dr. Kline on May 11, 2022, that he had regained all functions since his stroke except his left peripheral vision. (Tr. 485). This assertion garners support from numerous medical reports depicting Swindle did not complain of, or exhibit, residual stroke symptoms such as TVOs, tinnitus, double vision, nausea, vomiting, auditory of visual hallucinations, ataxia, slurred speech, facial droop, or numbness after his discharge from UAB Hospital following his stroke. (Tr. 360, 451, 356, 424, 321, 379, 604, 505, 377, 424, 461-62).

As for Swindle's mild cervical spondylosis, Swindle's physician ordered a cervical MRI in response to his complaints of a confirmed handgrip weakness and neck pain. (Tr. 571-72). The July 27, 2023, MRI of Swindle's cervical spine returned results facilitating a diagnosis of mild cervical spondylosis. (Tr. 573). Nevertheless, during the same time frame Swindle did not report difficulty walking or gait dysfunction. (Tr. 568, 571). To the contrary, he endorsed exercising occasionally, taking care of himself, climbing stairs, dressing, bathing, and running errands alone and without difficulty. (Tr. 568). Swindle's physician assessed normal motor strength and tone (notwithstanding

the left handgrip weakness), normal extremity movement, normal gait and station, and grossly-intact sensation. (Tr. 571). Nevertheless, the ALJ noted the medical evidence received after Dr. Kline's assessment necessitated limitations on Swindle's ability to perform medium work, as reflected in the RFC. (Tr. 20).

In sum, Swindle has not successfully undermined the substantial evidence supporting the ALJ's RFC assessment. Although Swindle maintains his symptoms limit him to a greater degree than the ALJ assessed, the court cannot reweigh the evidence or second-guess the ALJ's conclusions. *See Winschel*, 631 F.3d at 1178 (citations and internal quotation marks omitted). Thus, the ALJ did not err in assessing Swindle's subjective complaints, and Swindle's contrary interpretation of the evidence does not warrant reversal.

Swindle faults the ALJ's characterization of his daily activities for failing to acknowledge the corresponding limitations articulated in his testimony. (Doc. 13 at 11). Relying on *Horton v. Barnhart*, 469 F. Supp. 2d 10141 (N.D. Ala. 2006), Swindle contends the ALJ improperly failed to observe the limitations he described vis-à-vis his activities of daily living. (*See* doc. 13 at 12 ("According to the Plaintiff his daughter takes care of herself. The Plaintiff explained that when he walks the dogs it is only around ten to 15 minutes. He further indicated his wife helps with their dogs as well. The Plaintiff reported that he prepares his own meals but they consist of sandwiches and frozen meals which take 15 minutes to prepare. The Plaintiff reported he can vacuum but only twice a week and load the dishwasher occasionally. He further indicated he can shop

for groceries but only does so twice a week for 45 minutes to one hour." (citations omitted)). Although the ALJ did not recite certain limitations Swindle highlights, such omissions do not undermine the substantial evidence buttressing his decision.

The ALJ may consider the claimant's daily activities as one factor in evaluating subjective complaints. See 20 C.F.R. § § 404.1529(c)(3)(i), 416.929(c)(3)(i); *Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 663 (11th Cir. 2010) ("Although a claimant's admission that she participates in daily activities for short durations does not necessarily disqualify the claimant from disability, that does not mean it is improper for the ALJ to consider a claimant's daily activities at all."); *Harrison v. Comm'r of Soc. Sec.*, 569 F. App'x 874, 880 (11th Cir. 2009) (finding the claimant's daily activities of managing his personal care, preparing meals, shopping, caring for pets, watching television, using a computer, and socializing with others supported ALJ's credibility determination).

In *Horton*, the court noted the ALJ erred by selectively and disingenuously describing the claimant's daily living activities in rendering his adverse credibility determination, "as he accept[ed] her listing of her activities, but not her limiting description of them." *Horton*, 469 F. Supp. 2d at 1047. More specifically, the ALJ noted the claimant could drive a car and perform household chores; however, he omitted reference to the claimant's qualification that she could not drive far distances, and she performed chores "infrequently and sporadically, taking much longer to complete." *Id.* at n.2. The court thus concluded substantial evidence failed to support the ALJ's justifications for discrediting the claimant's testimony. *Id.* at 1047.

However, besides his "disingenuous" description of the claimant's daily living activities, the only other evidence the ALJ in *Horton* used to support his adverse credibility determination constituted a physician's opinion—which the court concluded the ALJ improperly rejected. *Id.* at 1045-47. Thus, the ALJ erroneously evaluated the claimant's subjective complaints in *Horton* because "the ALJ relied entirely on the [claimant's] daily activities in rejecting her pain testimony and allegation of debilitating pain, after improperly rejecting an opinion of the plaintiff's physician." *Hart v. Soc. Sec. Admin.*, No. 5:19-v-00811-SGC, 2021 WL 961786 (N.D. Ala. Mar. 15, 2021) (discussing the narrow context of the court's reasoning in *Horton*).

The court does not confront the same deficiencies in the case at bar. As the foregoing analysis portrays, the ALJ relied upon evidence in the medical records to contravene Swindle's report of his daily activities. Therefore, Swindle fails to establish the ALJ lacked substantial evidence as to this RFC determination in this regard.

## CONCLUSION

For the foregoing reasons, the court **AFFIRMS** the Commissioner's decision for review not inconsistent with the foregoing determinations. The court will enter a separate final judgment.

**DONE** this 29th day of August, 2025.

_____
HERMAN    N.    JOHNSON,    JR.
UNITED STATES MAGISTRATE JUDGE